```
 1            IN THE UNITED STATES BANKRUPTCY COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                     SHERMAN DIVISION

 3

 4   IN RE:                 )   BK. NO:  16-41222-BTR

 5                          )

 6   MAIN STREET SCHOOLS    )

 7      D E B T O R.        )

 8

 9

10            *   *   *   *   *   *   *   *   *   *

11              TRANSCRIPT OF PROCEEDINGS

12            *   *   *   *   *   *   *   *   *   *

13

14

15

16

17

18

19

20       BE IT REMEMBERED, that on the 8th day of September,

21   2016, before the HONORABLE BRENDA T. RHOADES, United States

22   Bankruptcy Judge at Plano, Texas, the above styled and

23   numbered cause came on for hearing, and the following

24   constitutes the transcript of such proceedings as hereinafter

25   set forth:
```

NATIONAL COURT REPORTERS (214) 651-8393

1                    I N D E X

2                                                    PAGE

3    BRIAN ZERN
          DIRECT EXAMINATION
4             BY:  Mr. Martin                         11
          CROSS-EXAMINATION
5             BY:  Mr. Liepins                         17
          REDIRECT EXAMINATION
6             BY:  Mr. Martin                         27

7    WILLIAM VESTERMAN
          DIRECT EXAMINATION
8             BY:  Mr. Martin                         30
              BY:  Mr. Liepins                         36
9         CROSS-EXAMINATION
              BY:  Mr. Martin                         51

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   E X H I B I T   I N D E X

 2                                          PAGE FIRST REFERENCED

 3   Exhibit A                                    17

 4   Exhibit B                                    20

 5   Exhibit C                                    21

 6   Exhibit D                                    22

 7   Exhibit E                                    24

 8   Exhibit F                                    25

 9   Exhibit G                                    26

10   Exhibit H                                    48

11   Exhibit I                                    49

12   Exhibit 2                                    32

13   Exhibit 3                                    30

14   Exhibit 11                                   34

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2                    COURTROOM DEPUTY:  Main Street Schools.  Case

3    16-41222.  Motion to dismiss Chapter 11 case and a motion for

4    relief from stay filed by Celtic Bank.

5                    THE COURT:  Okay.  Appearances.

6                    MR. MARTIN:  Erik Martin, Your Honor, for

7    Celtic Bank.

8                    MR. LIEPINS:  Eric Liepins here for the

9    debtor.

10                   THE COURT:  All right.  It's your motion.

11                   MR. MARTIN:  Your Honor, would you like to try

12   them both at the same time?

13                   THE COURT:  Yeah.  I think there's enough

14   overlapping evidence and facts.

15                   MR. MARTIN:  I think so.

16                   THE COURT:  All right.

17                   MR. MARTIN:  Your Honor, we're here on Celtic

18   Bank's motion to dismiss for relief from the automatic stay.

19   And cause exists to dismiss this case.  If Your Honor will

20   remember, in 2013 the same party was before the Court.  And

21   they went through bankruptcy and were going to be unable to

22   confirm a plan of reorganization.  And at Your Honor's

23   behest, they worked out a plan that was approved by this

24   Court, I mean a settlement agreement that was approved by

25   this Court.  And of that settlement agreement, a crucial part

1   of the consideration for allowing the debtors to exit

2   bankruptcy and resume their operations was the deed executed

3   by the debtors in favor of the Bank.  And what the plan said,

4   or the agreement said was, The debtor can exit bankruptcy.

5   Get back in operations.  If the default again, the Bank was

6   to hold the deed in escrow.  And upon default, subsequent

7   default, the Bank got the property back.  They already had

8   the deed that was executed by the debtor.  They agreed to

9   keep it in escrow, which they did, per order of the Court,

10  until the debtor began defaulting again.  And when that

11  happened, the Bank didn't immediately go file their deed,

12  which they had the right to do under order of this Court.

13  Instead, they tried to work it out with the debtor, again.

14  And then again.  And they kept trying to work it out with

15  them.

16      They entered multiple forbearance agreements.  They

17  waived late penalties.  They waived fees.  They didn't come

18  take the property, until it got to the point where they just

19  couldn't work it out.  The debtor hadn't made a payment in

20  seven or eight months.  And they decided it was time to make

21  a business decision, some of which is the escrow had certain

22  requirements on how long a loan could be in default.  And

23  this loan has been in default for over a year.  And so at

24  that point, they determined it was in the best interest of

25  the Bank to file their deed and take the property back.  So

1   the Bank set the deed for filing, only to learn from the

2   Denton County Clerk that the entity that held the property

3   had transferred the property to the debtor.

4        In the last case there were two -- two companies,

5   SchoolCo Realty owned the dirt.  Main Street Schools, which

6   is the debtor before the Court, owned the school and operated

7   the school.  Both of those companies entered into the

8   settlement agreement, which gave the Bank a deed in lieu of

9   foreclosure as consideration for allowing them to exit

10  bankruptcy and not -- I think they're in the middle of

11  contesting the plan.  And as I said, Your Honor suggested

12  that they work it out, and they did.

13       So when they filed the deed the Clerk called back and

14  said, or sent a letter and said, This company doesn't own the

15  property any more.  The debtor and the debtor's principal had

16  transferred it to the current debtor Main Street Schools,

17  which rendered that deed in lieu invalid.  It was moot.  And

18  so part of the consideration for allowing the debtors to exit

19  bankruptcy was taken away from the Bank.  So Celtic Bank went

20  through the state court process of noticing out for

21  foreclosure.  Filed their Substitute Trustee -- notice of

22  Substitute Trustee.  And had it noticed for foreclosure on

23  July 5th of this year.  And the debtor filed bankruptcy on

24  July 4th on the eve of foreclosure.

25       Cause exists to dismiss this case.  There's multiple

1   actions by the debtor, not the least of which was violating

2   this Court's prior order.  We can get on the record, I have a

3   senior vice president of the Bank here, who has managed this

4   asset for the last six plus years.  He's dealt with this

5   debtor.  We can go on ad nauseam on the lengths he's taken to

6   work out this debt.  It's not that the Bank has a debt and

7   wants to just swoop in and take the property.  They've tried

8   for years to work this out.  They've gone through a prior

9   bankruptcy.  They decided it was time to take it back.  And

10   then the debtor filed bankruptcy again.  And the only

11   plausible explanation for the deed and then the filing of

12   this petition was to forestall the Bank's ability to get

13   their property back.

14          And as I said, we've got the Bank representative here.

15   I know the debtor is here.  We can get them both on the stand

16   and get as much testimony as Your Honor would want.  But

17   cause exists to dismiss this case.  And we would ask that the

18   Court do just that and dismiss this bankruptcy case.

19          In addition, I think that per the prior order of the

20   Court, I think that instead of simply dismissing this case, I

21   think that the Court ought to order the debtor to execute

22   another deed and transfer the property, like they agreed to

23   do the first time.

24                  THE COURT:  Okay.

25                  MR. LIEPINS:  Good afternoon, Your Honor.

1   Eric Liepins here for the debtor.

2         This debtor operates a school.  About 50 students.  And

3   as counsel mentioned, the debtor did file a bankruptcy back

4   in 2013.  But it did reach a settlement with the lender and

5   the debtor performed under that settlement for more than a

6   year and a half before some unforeseen circumstances caused

7   the debtor to get behind.  The debtor attempted to work out

8   with the Bank to make up for those payments.  And when we get

9   to the testimony, the evidence will show, Your Honor, there

10  was no prohibition against the debtor filing a bankruptcy in

11  the settlement agreement.  In fact, it was contemplated in

12  the settlement agreement.  And the debtor could have filed a

13  bankruptcy day one, or it could have filed a bankruptcy on

14  the eve of foreclosure.

15              THE COURT:  You mean this debtor?

16              MR. LIEPINS:  This debtor.  And both debtors

17  could have filed.  There was no prohibition against either of

18  the prior debtors re-filing a bankruptcy after one year.

19  Settlement agreement says --

20              THE COURT:  That's not the issue, right?  The

21  issue is that your client, former client transferred an asset

22  to which they'd already granted a deed in lieu to the Bank,

23  right?

24              MR. LIEPINS:  That's true, Your Honor.

25              THE COURT:  At a time that the Bank had the

1    deed in lieu.

2              MR. LIEPINS:  True.  But that debtor could

3    have filed a bankruptcy at any time, even if they had the

4    deed in lieu.

5              THE COURT:  Sure.  Okay.  But that's not the

6    facts of this case, right?

7              MR. LIEPINS:  Well, I think --

8              THE COURT:  The issue is not the filing of the

9    bankruptcy.  The issue is having transferred title to an

10   asset that the Bank had a lien on and had in their possession

11   the deed in lieu, right?  You don't dispute any of those

12   facts, right?

13             MR. LIEPINS:  Don't dispute any of those

14   facts.

15             THE COURT:  Okay.  So isn't that the problem

16   you have, not that they filed bankruptcy, but having done

17   that, now they file bankruptcy?

18             MR. MARTIN:  Yes, Your Honor.  And he did it

19   while he was negotiating a forbearance agreement with the

20   Bank.

21             THE COURT:  I understand.

22             MR. MARTIN:  Your Honor, we have here really

23   today two motions; a motion to dismiss, which obviously the

24   parent argument appears to be one of good faith.  And the

25   second issue is a motion for relief from stay.  The second

1   motion appears to be one that the debtor does not have the

2   ability to pay the Bank any sort of adequate protection or

3   reorganize this case.  We believe that if we actually get --

4   when we get to the evidence, Your Honor, you will see that

5   the debtor does have the ability to make adequate protection

6   payments.  It does have the ability to file a plan.  And the

7   debtor had -- it isn't sort of a Little Creek case where the

8   debtor transferred this property on the eve of bankruptcy.

9   There was a transfer done.  But it was eight months prior to

10  the bankruptcy being filed.  It wasn't the day before, or any

11  of those sort of factors.  And the debtor is here to testify

12  as to why that was done.  The Court will take that into

13  evidence and decide.  But we believe that this debtor has the

14  ability to reorganize.  We believe this debtor has the

15  ability to make an adequate protection payments.  And we

16  believe that the Court should not dismiss this case, but

17  allow the debtor to move forward with this bankruptcy so that

18  the Bank can be repaid and the debtor can be done with this

19  once and for all.  And we're prepared to move forward with

20  our evidence, Your Honor.

21              THE COURT:  Okay.  All right.  You may call

22  your first witness.

23              MR. MARTIN:  Your Honor, we call Brian Zern.

24              THE COURT:  Mr. Zern, if you'll step forward

25  and be sworn.

1            (The witness was sworn by the courtroom deputy.)

2                         BRIAN ZERN

3    The witness, having been duly sworn to tell the truth,

4    testified on his oath as follows:

5                       DIRECT EXAMINATION

6    BY MR. MARTIN:

7        Q.    Good afternoon, Mr. Zern.  Would you state your

8    name for the record.

9        A.    Brian Zern, Z-e-r-n.

10       Q.    And what's your position with the Bank?

11       A.    I'm a senior vice president of specials assets and

12   loan servicing for Celtic Bank.

13       Q.    Okay.  And how do you know this debtor?

14       A.    Mr. Vesterman has worked with Celtic Bank for

15   several years.  And I became familiar with him, I believe, in

16   2009, if I recall correctly.  And I know him through a series

17   of workout agreements and different issues that have come up

18   with his particular loan.

19       Q.    So you service the debtor's loan, the Main Street

20   School's loan?

21       A.    Correct.

22       Q.    Okay.  So you're intimately familiar with this

23   debtor and the debtor's history?

24       A.    Yes, sir.

25       Q.    Okay.  Let's talk a little bit about that.

1      About when did, if you recall, did the debtor start

2  having problems with this loan?

3      A.   I don't have exact date in mind.  But if I had to

4  pull one out and recall it, it probably would have been

5  somewhere in 2010 when there were a few issues back and

6  forth.  It was early on from the time that we received this

7  loan.  But that's the test of my recollection.

8      Q.   Okay.  And then what happened after that?  Did you

9  all try and work it out and they filed bankruptcy?

10     A.   Correct.  We tried several times.  We put together

11  a different change in terms agreements, which is what we call

12  them.  These agreements extended the periods where he didn't

13  have to make payments.  Where obligations weren't going to be

14  due for a period of months.  Interest only payments for a

15  period of months.  Forbearance agreements so that we didn't

16  foreclose on him.  And we made several attempts to try to

17  work through the process with Mr. Vesterman and the debtor.

18     Q.   Okay.  And then the bankruptcy in 2013.  What

19  happened in that case?

20     A.   We came before the Court and everything was heard.

21  And as you had mentioned earlier, the -- the judge asked us

22  that we should either -- if we continued, she would likely

23  rule in favor of Celtic Bank, or we could go make an

24  agreement in the other room.  We went in the other room and

25  made an agreement.  (Indecipherable few words) on an

1  agreement was I was absolutely uneasy with the idea that the

2  debtor would actually perform --

3              MR. LIEPINS:  Objection, Your Honor.  If he's

4  going to testify about a document, that document should be in

5  evidence.

6              THE COURT:  I thought he was going to testify

7  about how he felt.

8              MR. LIEPINS:  I thought he said this is what

9  the document said.  That's what I thought he just said --

10             THE WITNESS:  No.  I said, I felt.

11             THE COURT:  All right.  Objection is

12 overruled.

13     .  So --

14     Q.  You were talking about the settlement agreement

15 that you worked out.

16     A.  What I felt when we were working out the settlement

17 agreement was that the debtor would not have the ability to

18 perform, due to the history that I'd had with them.  And so

19 within that agreement, it was paramount to me that we got a

20 deed in lieu on the particular property, so that in a case of

21 default, again, I wouldn't have to go through the same

22 process that I'd gone through before and we'd be able to go

23 collect upon the debt rapidly and move this along for the SBA

24 and Celtic Bank.

25     Q.  So would you say that was part of the consideration

1  for the deal?

2      A.   Yes, absolutely.

3      Q.   A vital part?

4      A.   The most important part.

5      Q.   Okay.  And so what did you do with that deed?  Did

6  you hold it in escrow?

7      A.   Absolutely.  We held it in escrow for the entire

8  term of the agreement.  And during that time the debtor did

9  perform for a period of time.  But then became delinquent on

10 payments.

11     Q.   Okay.  And do you remember how long it was after

12 the bankruptcy that the debtor started having payment

13 troubles?

14     A.   I don't recall.  But I don't have any -- hearing

15 opposing counsel state, it was about a year.  That sounds

16 about right.

17     Q.   Okay.  And so by the end of 2014, or 20 -- by the

18 end of 2015, were you in negotiations with the debtor again?

19     A.   Yes, absolutely.  We had been working with him back

20 and forth.  At the beginning, if I recall correctly, it was

21 more -- they were a couple of payments behind.  How are we

22 going to give you a few extra months to get these payments in

23 to either become current, or we would work out another

24 portion of the agreement that would get him there.  But our

25 intent was always to try to work with the debtor.

1    Q.    Now tell the Court a little bit about that.  I

2    mean, did you want this debtor to fail?

3    A.    No, absolutely not.  He operates a school.  I've

4    always -- I would say prior to the last occurrence what had

5    happened with the property, I've always had really warm

6    feelings towards the debtor.  I wanted him to succeed.  I had

7    every intention that he could succeed.  I thought that up

8    until that point, he was honest.  And I wanted it to work

9    out.

10    Q.    And what changed that feeling?

11    A.    The change when we found out that the property had

12    been transferred.  I felt that that was an act of bad faith.

13    He had been talking to me for a period of time.  Never once

14    mentioned that he was going to do that.  And in my view,

15    there was no other reason to have done that, besides just to

16    protect himself in case I went to go record that deed.  And I

17    felt as though the Bank was very up front with him about what

18    we were going to do at every point in time.  And I didn't get

19    that in return.  So I felt that I could no longer trust what

20    was being told to me.

21    Q.    So how did you find out about that deed, did the

22    debtor come to you and tell you?

23    A.    No.  I found out through you, I believe.

24    Q.    Was it through trying to file the deed?

25    A.    Correct.

1    Q.   So after you found out that the previous debtor no

2   longer owned the property, what actions did you take?

3    A.   Well, I really wanted to bring other case.  This is

4   (indecipherable word) against the debtor.  But what we did

5   under your advice was follow the Court procedures and we

6   filed for a foreclosure and notice of default on the property

7   to collect.

8    Q.   So I just want to touch on that one more time.  In

9   your view, is there any other reason that he filed this

10  bankruptcy, other than to avoid the foreclosure?

11   A.   Absolutely not.  In my opinion, there was no other

12  reason -- if he had intentions to work with Celtic Bank, I

13  was at the table willing to work with him on several

14  occasions.  Maybe it wasn't exactly how he wanted to see

15  things.  But that recording of the deed, in my opinion, had

16  no other purpose, aside from just prolonging what the Bank

17  would inevitably do and what he had already agreed upon.

18   Q.   Okay.  And is there -- does the debtor have any

19  equity in this property?

20   A.   No.  There isn't any equity.

21   Q.   Do you know roughly what the debt is?

22   A.   Yeah.  The debt is just over a million dollars.  I

23  think its 1,098,000 and some change.

24   Q.   And what do you think the property is worth?

25   A.   I believe the last appraisal that came in was

1  680,000, on that particular property.

2       Q.   So about 400 grand upside down?

3       A.   Uh-huh.

4       Q.   Nothing further at this time, Your Honor.  We'll

5  pass the witness.

6       A.   Okay.

7            MR. LIEPINS:  May I approach, Your Honor?

8            THE COURT:  You may.

9                     CROSS-EXAMINATION

10 BY MR. LIEPINS:

11      Q.   Mr. Zern, I've handed you an exhibit binder there.

12 And I want to draw your attention first to Exhibit A in that

13 binder.

14      A.   Yes, sir.

15      Q.   When counsel was asking you questions earlier about

16 the prior bankruptcy, you were mentioning a settlement

17 agreement.  Do you recall that testimony?

18      A.   I do recall that, yes.

19      Q.   And what's marked as Exhibit A, is that the

20 settlement agreement you were talking about?

21      A.   I would have to read through it.  But it appears to

22 be, yes, sir.

23            MR. LIEPINS:  Your Honor, I move to admit

24 Exhibit A.

25            THE COURT:  Any objections?

1           MR. MARTIN:  No objections.

2           THE COURT:  Exhibit A is admitted.

3       Before we go through all of this, I think we've been

4   handed -- well, I think -- hold on a second.  I think the

5   Bank has handed up some exhibits that are --

6           MR. MARTIN:  Not in a binder.

7           THE COURT:  Right.  But they are also labeled

8   A, B, C.  I'm going to hand them back to you and we're going

9   to mark them 1, 2, 3, 4, however many there are.  And just so

10  we don't have to go through this exercise, I think the debtor

11  has handed up Exhibits A through I.

12          MR. LIEPINS:  Correct, Your Honor.

13          THE COURT:  Is there any objection to the

14  admission of Exhibits A through I?

15          MR. MARTIN:  No, Your HOnor.

16          THE COURT:  Okay.  And then the Bank has

17  handed up --

18          MR. MARTIN:  1 through 4.

19          THE COURT:  What's now marked Exhibits 1

20  through 4.  Any objections to those exhibits, Mr. Liepins?

21          MR. LIEPINS:  I haven't been provided with

22  them, Your Honor.  I don't know what they are.

23          THE COURT:  You don't know what they are.

24  Okay.  Do you want to hand them to Mr. Liepins real quick so

25  he knows what they are?

1          MR. LIEPINS:  We have no objection to 1

2    through 4, Your Honor.

3          THE COURT:  Okay.  Then Exhibits 1 through 4

4    are admitted.

5      Now let's turn back to the examination of this witness.

6      Q.   Mr. Zern, looking at Exhibit A.  As I understand it

7    from your earlier testimony that you were involved in the

8    drafting of this settlement agreement?

9      A.   I don't think I would use the word "drafting", but,

10   yes, I was involved in the discussions pre-draft.

11     Q.   That's fair.  How about negotiations of this

12   settlement agreement?

13     A.   Fair enough, sir, yeah.

14     Q.   Okay.  Now, take a look for me, if you will, on

15   page 5 of Exhibit A.

16     A.   Yes, sir.

17     Q.   And under page 5, subsection C, dismissal of

18   Chapter 11 cases and then it's paragraph 5, do you see that,

19   sir?

20     A.   Yes.

21     Q.   Isn't it true that it was expressly, at least

22   contemplated or delineated in this settlement agreement that

23   the debtor might file a bankruptcy again?

24     A.   It appears to be, yes.

25     Q.   And there was a prohibition against not filing it

1    within a year?

2         A.    Correct, sir.

3         Q.    And this was done in January of 2014; is that your

4    recollection, sir?

5         A.    Yes.

6         Q.    And you'll agree with me that the debtor made

7    payments under the terms of this settlement agreement after

8    January 2014?

9         A.    Yes, sir.

10        Q.    And, in fact, the debtor made payments in this --

11   under this settlement agreement until October of 2015; isn't

12   that correct?

13        A.    Yes, sir.  The last due date on the loan as of

14   today is October 2015.  That does not mean there weren't some

15   issues prior to that, but, yes.

16        Q.    Now, you were talking on your direct examination

17   about the fact that the debtor -- strike that.  That was a

18   poor question.

19         Let's go to Exhibit B for me, please.

20        A.    Yes, sir.

21        Q.    Now, do you recognize Exhibit B?

22        A.    Yeah.  It appears to be a notice of default and

23   demand of payment that we send out when payments are due for

24   a debtor.

25        Q.    And Kelsey Garnet would have been someone in your

1  office?

2       A.   Kelsey Garrett, yes.

3       Q.   Okay.  And this document says, paraphrasing it, but

4  you can read through it, if you will.  It's dated November

5  5th, 2015.  So just after the last payment of October 2015.

6  And it basically gives the debtors five days to make some

7  payments or it was going to be in default, correct?

8       A.   Sure, yes.  That's what it says.

9       Q.   Okay.  So would you agree with me -- well, let me

10  ask you this.  Did you receive any payments based upon your

11  review of your records between November 5th and November

12  10th, 2015?

13      A.   I don't believe we did.

14      Q.   And would it have been within the Bank's rights, in

15  your opinion, to have filed its deed on the property on

16  November 11th, 2015?

17      A.   Yeah.  I think we had the right to do it before

18  then, as well.

19      Q.   Now, would you turn with me to tab C?

20      A.   Yes, sir.

21      Q.   And does this appear to be a series of emails

22  between you and Mr. Vesterman, along with Mr. Orgil at your

23  Bank?

24      A.   That's right.  That's what it appears to be.

25      Q.   And they start -- I really just want to pay

1  attention to the first page of those emails.  And this is an

2  email from you to Mr. Vesterman.  And the first paragraph

3  talks with, I'm sorry about the delay.  The middle of that

4  paragraph says, I know you are a man of your word and have

5  always completed the things you have said were you going to

6  do; is that correct?

7       A.   Yeah.  That's what it says.

8       Q.   And it's true then between the time period of the

9  settlement agreement and up until this November 11th letter

10  email, that Mr. Vesterman was doing what he told he was going

11  to do and doing what was required of him?

12      A.   Mr. Vesterman always struggled with making his

13  payments.  But that said, yes, I always felt as though he'd

14  come to the table and speak with me and make his payments and

15  eventually we would work it out.

16      Q.   Now, isn't is true that based upon the settlement

17  agreement, that SchoolCo could have filed bankruptcy any time

18  after January 2015?

19      A.   Yes, they could have.

20      Q.   And they wouldn't have been in violation of this

21  settlement agreement, would they?

22      A.   I'm not an attorney, but I don't believe they would

23  have been, no.

24      Q.   Now, turn with me to Exhibit D.  And this is the

25  warranty deed where SchoolCo transferred the property into

1  Main Street, correct?

2      A.    Correct.

3      Q.    Okay.  Are Main Street and SchoolCo both liable on

4  the debt to the Bank?

5      A.    Yes.  I believe one is the debtor and the other is

6  a guarantor on the note.

7      Q.    And to the best of your knowledge, do you know what

8  location Main Street School operates out of?

9      A.    I do not.  I'm sorry.

10      Q.    Do you believe that Main Street Schools operates

11  out of the property that we've been talking about?

12      A.    That would not be a surprise to me, no.

13      Q.    Now, you mentioned during your testimony that you

14  were working on -- strike that.

15      After your November 5th letter and then your reply by

16  email on November 11th, did you continue -- did Mr. Vesterman

17  continue to try and communicate with the Bank to work

18  something out?

19      A.    I don't recall.  I do recall there was a period of

20  time when Mr. Vesterman went silent because he knew in my

21  view there was nothing that was going to be worked out at

22  that point in time.  And so I believe between this November

23  11th and the 24th, or whenever, he filed that deed.  There

24  was a period, or there was some email correspondence that

25  would have stated that we were done working with him, unless

1  he could bring all of the payments current.  But I don't know

2  if that answers your question.

3      Q.    Let's take a look at Exhibit E for me for just a

4  minute.

5      A.    Sure, no problem.

6      Q.    Now, Exhibit E, again, appears to be a series of

7  emails between Mr. Vesterman, Mr. Orgil, and also you, at

8  least at the start; is that correct?

9      A.    Yes, sir.

10      Q.    I want you to turn to the third page for me.

11      A.    I'm there.

12      Q.    I'm sorry, the second page, second page.

13      A.    Okay.

14      Q.    And I want to look at the last entry on the second

15  page of those emails.  And it appears to be from Mr. Orgil to

16  Mr. Vesterman copied to you requesting some information.  Do

17  you see that?

18      A.    Correct.

19      Q.    All right.  And then going to the first page, does

20  this appear to be on December 21st, 2015 Mr. Vesterman

21  providing some financial information to the Bank, or to Jeff

22  Orgil at his request?

23      A.    Correct.

24      Q.    Attached to this email does appear to be certain

25  financial records.  Do you know if you ever reviewed any of

 1  these financial records?

 2       A.   I did, yes.

 3       Q.   If you'll turn with me to Exhibit F.

 4       A.   Yes, sir, I'm there.

 5       Q.   And, again, is this a string of emails -- a

 6  continuation, actually, of the stream of emails that we

 7  looked at in the last exhibit between Mr. Vesterman,

 8  Mr. Orgil, and yourself?

 9       A.   Yes, sir, it appears to be.

10       Q.   All right.  I want you to take a look at the second

11  page for me.

12       A.   Okay.

13       Q.   That email, the second page, is Mr. Vesterman

14  reaching out to Mr. Orgil asking if he received the files and

15  wanting to know what he thought about that; is that correct?

16       A.   It appears to be, yes.

17       Q.   Now, on the first page of Exhibit F, Mr. Orgil is

18  responding to Mr. Vesterman at the bottom about the financial

19  information he got, right?

20       A.   Correct.

21       Q.   And at the last sentence of that email says, But

22  for now, all payments have to be brought current?

23       A.   Correct.

24       Q.   Were you aware fro your discussions with

25  Mr. Vesterman in the Fall of 2015 about what had happened to

1  the school that caused them to not make their payments?

2      A.    I believe, yes, I have had a discussion with

3  Mr. Vesterman about that personally, I believe, I did.

4      Q.    And do you recall what the problem was at that

5  time?

6      A.    If I'm not mistaken, I believe that he had a

7  manager or a general key player that had been managing the

8  books for him and doing everything for the school.  Again, if

9  I recall correctly, it had more to do with they had handled

10  most of the marketing and things like that.  And that had

11  caused him, in his view, a situation where he was in dire

12  need to find somebody else.

13      Q.    And then lastly, would you take a look for me at

14  Exhibit G?

15       And, again, this appears to be an email from

16  Mr. Vesterman to Mr. Orgil that you were copied on; is that

17  correct?

18      A.    Correct.

19      Q.    All right.  And this is Mr. Vesterman reaching out

20  to Mr. Orgil, again, talking as you just did in the third

21  paragraph about the loss of the director and wanting to

22  discuss how he could catch up payments.  Do you recall that?

23      A.    I do.

24      Q.    Did you have any response to this email, that

25  you're aware of?

1       A.   I don't remember.  I believe that we had a phone

2  conversation post this.  But I don't recall.

3       Q.   Under the terms of your workout, the debtor was to

4  pay $7,000 a month, correct?

5       A.   Sounds correct.

6             MR. LIEPINS:  Your Honor, I'll pass the

7  witness.

8             THE COURT:  Redirect?

9             MR. MARTIN:  Short redirect, Your Honor.

10                 REDIRECT EXAMINATION

11 BY MR. MARTIN:

12      Q.   Mr. Zern, after the bankruptcy and until, what

13 we'll call the final default, what was it like getting

14 payments out of Mr. Vesterman?

15      A.   With Mr. Vesterman there were always periods of

16 time, through my history with him, where it was difficult to

17 get payments.  There was always a reason that would come up

18 on his side of why the payments could not be made.  But it

19 was always a difficult process.  We'd get behind quite

20 frequently.  He'd go for a period of time and operate well.

21 And then he'd get behind on his payments again.

22      Q.   If you'd turn to Exhibit E with me real quick.

23      A.   Yes, sir.

24      Q.   Now, towards the last full communication there is

25 from Bill Vesterman to Jeff Orgil and yourself.  Can you read

1  me the last sentence that starts with, It shows that?

2       A.    Correct.  And this is the biggest issue.  It shows

3  that our revenues increased remarkably in the past three

4  years to 316k in 2015 from 265k in 2013.

5       Q.    And why was that an issue?

6       A.    Well, because the debtor was calling.  And the

7  reasons for his issues with his business that he had marked

8  towards me was this loss of the director.  But due to the

9  financials that he submitted to me, it didn't make sense

10 because his income had increased.  And, also, his student

11 head count, if I can recall correctly, had increased from

12 before.  So he was making more money then he'd ever made

13 before within the business.

14      Q.    And he didn't give you an explanation that made you

15 feel comfortable with that?

16      A.    Correct, no.  I never got one.

17      Q.    Okay.  If you'd turn to Exhibit F real quick.

18      A.    Yes, sir.

19      Q.    So at the bottom there's an email from your

20 colleague, Jeff Orgil, to Mr. Vesterman in which Mr. Orgil

21 expresses the same concern.  Can you take a look at the

22 second sentence in that paragraph?

23              THE COURT:  Okay.  I don't need him to read it

24 to me.  Okay.  It's been admitted and I can read.  So if you

25 want to argue from it, you can argue from it in closing.

1            MR. MARTIN:  Okay, Your Honor.

2       Q.   So at this point, were you starting to lose trust

3  with the debtor?

4       A.   Yes, absolutely.  I directed Jeff to send a

5  response of this nature to Mr. Vesterman, because I wanted

6  some clarity on these issues.

7       Q.   And then that loss in trust, did it culminate with

8  the filing of that deed?

9       A.   Yes.  Absolutely.

10           MR. MARTIN:  Nothing further, Your Honor.

11           THE COURT:  Thank you.  All right.  Anything

12  further for this witness?

13           MR. LIEPINS:  No, Your Honor.

14           THE COURT:  All right.  The witness may step

15  down.

16           THE WITNESS:  Thank you, Your Honor.

17           THE COURT:  All right.  We're going to take a

18  brief recess before we continue the balance of this hearing.

19  Let's take a recess for 10 minutes.

20                (Brief recess ensued.)

21           THE COURT:  All right.  We're back on the

22  record in the Main Street Schools, LLC case.  16-41222.

23  Mr. Martin, you may call your next witness.

24           MR. MARTIN:  Your Honor, we call William

25  Vesterman.

1                    THE COURT:  Okay, Mr. Vesterman, please step

2    forward and be sworn.

3                    (The witness was sworn by the courtroom deputy.)

4                    MR. MARTIN:  May I approach the witness, Your

5    Honor?

6                    THE COURT:  You may.

7                    WILLIAM VESTERMAN

8    The witness, having been duly sworn to tell the truth,

9    testified on his oath as follows:

10                    DIRECT EXAMINATION

11   BY MR. MARTIN:

12       Q.   Mr. Vesterman, I've just handed you what's been

13   pre-marked as Exhibits 1 through 4.

14        Can you state your name for the record.

15       A.   William Vesterman.

16       Q.   And what's your position with the debtor?

17       A.   I'm the owner.

18       Q.   And do you also operate the company?

19       A.   Yes.

20       Q.   Okay.  If you would, turn to -- let's start with

21   Exhibit 3.  And if you would, turn to page 4.

22       A.   Yes.

23       Q.   Who is Arelya Zahintamare?

24       A.   She is the -- one of the two former owners of the

25   school.

NATIONAL COURT REPORTERS (214) 651-8393

```
 1      Q.    Okay.  And who is the other one?

 2      A.    Mary Kay Gammill.

 3      Q.    Okay.  And I see them here as an unsecured creditor

 4  in your prior case?

 5      A.    Yes.

 6      Q.    What sort of debt is that?

 7      A.    That was an agreement between me and the old owners

 8  that we would pay them so that they could train us to -- to

 9  learn how the school operated.

10      Q.    Okay.  And what was their profession?

11      A.    They were the former owners of the school for 19

12  years.

13      Q.    Okay.  And were they teachers?

14      A.    Yeah.  They were teachers and directors of the

15  school.

16      Q.    Okay.  And you said you had paid them -- what was

17  the -- how much was the agreement for?  What did you agree to

18  pay them?

19      A.    $25,000.

20      Q.    Okay.  So $12,500 apiece?

21      A.    Yes.

22      Q.    And what year was that that you bought the school?

23      A.    2006.

24      Q.    Okay.  And this was in 2013.  So you paid each of

25  them $3,500 in that 7 years?
```

```
 1       A.    Yes.

 2       Q.    And look at Exhibit 2 for me, page 4.  Sorry, it's

 3   page 6.

 4       A.    Chapter 11 204 -- it's the sixth page of the

 5   packet?

 6       Q.    Yes.  Is that the same Arelya Zahintamare?

 7       A.    Yes.

 8       Q.    And is she owed the same $9,000?

 9       A.    Yes.

10       Q.    So you didn't make any payments to her in between

11   '13 and this current case?

12       A.    Not that I recall.  I've spoke with her and told

13   her he situation we were in.  Told her that we were going to

14   try to enter a bankruptcy so that we could take care of her

15   as a creditor.

16       Q.    And on the next page, Mary Kay Gammill, is she also

17   still owed $9,000?

18       A.    Yes.

19       Q.    So you didn't make any payments to her from '13 to

20   '16?

21       A.    No.  Not that I recall, no.

22       Q.    And on that same page on Exhibit 2, page 2, there's

23   a debt to Pitney Bows.  Do you see that?

24       A.    Yes.

25       Q.    For $172.28?
```

1     A.   Yes.

2     Q.   If you'll turn to Exhibit 3, page 3.  I'm sorry,

3   Exhibit 3, page 5.  Is that the same Pitney Bows?

4     A.   Yes.

5     Q.   Is that for the same amount, 172.28?

6     A.   Yes.

7     Q.   So you didn't pay anything between '13 and '16 on

8   that debt either?

9     A.   That I do not recall.

10     Q.   Well, I'll represent to you that there's a number

11   of debts in there that are the same from '13 to '16?

12     A.   Yes.  Most of them -- a lot of them people said

13   they were writing off, but I included them in the bankruptcy

14   because I wanted to get them taken care of.

15     Q.   So these creditors wrote this debt off, yet you

16   still included them in your current schedules?

17     A.   Yes.  It's still on my books.

18     Q.   Do you intend to pay them?

19     A.   I would like to pay all my debts, yes.

20     Q.   But you didn't pay them anything between '13 and

21   '16?

22     A.   No.

23     Q.   So part of the transfer that you made, who owned

24   the real estate?

25     A.   SchoolCo Real Estate, Ltd.

1      Q.    And Main Street operates the school?

2      A.    Yes.

3      Q.    Did you have a lease agreement with SchoolCo?

4      A.    Yes.

5      Q.    How much rent did -- was Main Street to pay

6   SchoolCo?

7      A.    $7,000 per month.

8      Q.    Did Main Street ever make that rent payment?

9      A.    Yes.

10      Q.    When was the last time Main Street paid rent?

11      A.    September of 2015.  Oh, Main Street paying rent,

12   no.  Main Street started paying the lender directly.

13      Q.    Right.  But -- so Main Street doesn't pay rent to

14   operate that space, to occupy that space?

15      A.    No.

16      Q.    Then if you would look at Exhibit 4.

17        Do you recognize this document?

18      A.    Yes.

19      Q.    What is it?

20      A.    Special general warranty deed.

21      Q.    From whom to whom?

22        Is this deed from SchoolCo to Main Street of the

23   property?

24      A.    Yes.

25      Q.    And did you execute it?

1      A.   Yes.

2      Q.   On November 20th, 2015?

3      A.   Yes.

4      Q.   And were you negotiating with the Bank at that

5   time?

6      A.   Yes.

7      Q.   Did you give the Bank notice that you were going to

8   file this deed?

9      A.   No.

10      Q.   Why not?

11      A.   I was scared that I was going to have to -- well,

12   when I got the letter, I got scared that the Bank was going

13   to foreclose, maybe even foreclose right in the middle of the

14   school year and put everybody out on the street.  And I was

15   scared that I would have to pay for two bankruptcies, which I

16   did the first time.  So -- and that was expensive.  So I

17   transferred the document so that I would only have to pay for

18   one bankruptcy, if we couldn't work things out.

19      Q.   So you filed the deed to avoid the foreclosure?

20      A.   Well, I filed it so that I could pay for one

21   bankruptcy.

22      Q.   And you didn't give the Bank notice of it?

23      A.   No.

24           MR. MARTIN:  Pass the witness, Your Honor.

25           THE COURT:  Okay.  Cross?

NATIONAL COURT REPORTERS (214) 651-8393

1                    MR. LIEPINS:  I'll reserve my questions until

2     my case in chief.

3                    THE COURT:  Do you have any other witnesses

4     you intend to call, sir?

5                    MR. MARTIN:  No, Your Honor.

6                    THE COURT:  Well, I think you can start right

7     now.

8                    MR. LIEPINS:  Thank you, Your Honor.

9                    <u>DIRECT EXAMINATION</u>

10    BY MR. LIEPINS:

11       Q.   Mr. Vesterman, what is your background in

12    education?

13       A.   I've been -- I've had leadership positions in

14    schools since 1999.  I took time off to volunteer as a Marine

15    Corp. Infantry Officer and I did two tours in Iraq, combat

16    tours.  But when I got off of active duty, I purchased a

17    Montessori (indecipherable word) in 2006.  And I've operated

18    for ten years.

19       Q.   And what grade levels does this school serve?

20       A.   Toddler, Pre-K, and elementary through 5th grade.

21       Q.   You mentioned that you purchased a school in 2006.

22    How long had the school been operating as a school at that

23    location?

24       A.   Since 1987.

25       Q.   And just in general, can you describe to the Court

1  where this school is located?

2      A.   It's in -- it's in an area of Flower Mound that's

3  surrounded by a suburban housing and farms, many of which are

4  getting developed into housing at this time.

5      Q.   Are there current housing developments going up

6  around school?

7      A.   Yes.   There's about 10 to 15 percent of Canyon

8  Falls, about 4 miles away, is completed.   That's going to be

9  2,200 homes.   10 to 15 percent of Harvest, which is about 7

10  or 8 miles away is completed.   That's going to be 3,300

11  homes.   Lantana is 2 miles away.   They're still building.

12  And Toll Brothers just bought a firm about a mile from the

13  school.   And Bud Bartley is also developing within a mile and

14  a half of the school.

15      Q.   Now with respect to the school.   Are you the face

16  of the school?

17      A.   The director of our school is the face of our

18  school.   And I am in close support of that director.

19      Q.   Is the director of the school really the most

20  important person of the school, as far as getting out and

21  meeting with the parents and things of that nature?

22      A.   Yes, for a lot of reasons, including the fact that

23  a lot of decisions that are made by parents when they enroll

24  their children are emotional decisions.   And a good director

25  is good at that emotional bond with the parents.

```
 1      Q.   Now, as we've said before, this company and

 2  SchoolCo, Main Street and SchoolCo filed a bankruptcy in

 3  2013, correct?

 4      A.   Yes.

 5      Q.   Were you involved in that proceeding?

 6      A.   Yes.

 7      Q.   And eventually, as we've discussed, that bankruptcy

 8  was dropped, correct?

 9      A.   Yes.

10      Q.   Now as part of that dropping, there was a

11  settlement agreement entered into, right?

12      A.   Yes.

13      Q.   You should have a book in front of you, a black

14  book that has exhibits in it.

15      A.   I'm sorry, I do not.

16           MR. LIEPINS:  May I approach, Your Honor?

17           THE COURT:  You may.

18      Q.   Take a look for me at Tab A.

19       Do you recognize that document?

20      A.   Yes.

21      Q.   Were you involved in putting together that

22  document?

23      A.   No.

24      Q.   Were you involved in negotiating that document?

25      A.   Only to the point that I signed.
```

1      Q.    And explain to me what you mean by, only to the

2   point that I signed it.

3      A.    It was presented to me as a take it or leave it.

4      Q.    By Celtic Bank.

5      A.    Yes.

6      Q.    Now under that agreement -- I don't think it's

7   attached to here entirely.  But how much were your monthly

8   payments to Celtic Bank?

9      A.    $7,000 per month.

10     Q.    And those payments were to start in January of

11  2014; is that right?

12     A.    Yes.

13     Q.    In January of 2014, how many students did the

14  debtor have, did Main Street have?

15     A.    30 students.

16     Q.    30?

17     A.    Yes.

18     Q.    Was the debtor able to make its payments to Celtic

19  Bank under this settlement agreement in January of 2014?

20     A.    Yes.

21     Q.    Now, I want to talk a little bit about that.

22       The real estate was owned by SchoolCo, correct?

23     A.    Yes.

24     Q.    And who owns SchoolCo?

25     A.    I do.

1      Q.    You own SchoolCo.  And are you the 100 percent

2  owner of Main Street also?

3      A.    Yes.

4      Q.    Did SchoolCo make the payments to Celtic, or did

5  Main Street make the payments?

6      A.    Main Street.

7      Q.    And so did Main Street and SchoolCo actually have a

8  lease that was in place and operational in January of 2014?

9      A.    It wasn't operational.

10      Q.    And does SchoolCo have any bank accounts or any

11  employees?

12      A.    No.

13      Q.    And did it have --

14      A.    We shut down the SchoolCo bank account.

15      Q.    Did SchoolCo have any operations, other than owning

16  this real estate?

17      A.    No.  Only property tax.

18      Q.    Now -- so Main Street made the payments directly to

19  Celtic under the terms of this settlement agreement; is that

20  right?

21      A.    I would have to look.

22      Q.    Well, let me ask you, sir, did Main Street make the

23  payments or did SchoolCo make the payments?

24      A.    Main Street made the payments.

25      Q.    Did they make the payments all the way through

1  2014?

2       A.    Yes.

3       Q.    Did they make the payments in 2015 for a period of

4  time?

5       A.    Yes.

6       Q.    Did there come a time in 2015 when Main Street was

7  unable to make the payments?

8       A.    Yes.

9       Q.    And when was that?

10      A.    October 2015.

11      Q.    Did anything happen or any major event happen in

12 2015 that caused the debtor to stop being able to make its

13 payments?

14      A.    Yes.

15      Q.    What was that?  What happened?

16      A.    We hired a new director in the beginning of 2015.

17 And she was doing a great job of implementing our enrollment

18 procedures.  In the Spring of 2015, during the busy part of

19 the enrollment season, she had -- she was an only child and

20 she had two parents and a step-parent whose health started

21 declining.  She had to start spending time away from her

22 duties at the school.  And it started affecting our

23 enrollment.  In the Fall of 2015, there was a precipitous

24 decline in her parents' health and she had to leave

25 altogether.

1        Q.    What affect did that have on the debtor's ability

2  to make the payment to Celtic Bank?

3        A.    We weren't able to enroll normally.  And basically

4  we lost a whole class of enrollment for that year.  And had

5  to get a new director in place and recover from that.

6        Q.    And by October of 2015, how many students did the

7  debtor have?

8        A.    24.

9        Q.    Now, did you contact the Bank when you knew you

10 weren't going to be able to make your payment after October

11 2015?

12       A.    Yes.

13       Q.    And who was your contact at the Bank?

14       A.    I had two contacts; Jeff Orgil and Brian Zern.

15       Q.    Now, take a look for me at Exhibit B in the book I

16 have in front of you.

17        Did you receive this letter?

18       A.    Yes.

19       Q.    What did you think when you received this letter in

20 November of 2015?

21       A.    I thought I might have an immediate foreclosure.

22       Q.    And, in fact, if you would take a look for me at

23 Exhibit C on the second page in the middle.  Is that an email

24 from you dated November 3rd, 2015 to Mr. Zern?

25       A.    Yes.

1      Q.    And this is where it says you just found out about

2    a change in your account?

3      A.    Yes.

4      Q.    And did that concern you?

5      A.    Yes.

6      Q.    Why did it concern you?

7      A.    Well, normally we were able to work things out.

8    And this happened very quickly after a missed payment.  So

9    that's why I was worried about immediately foreclosure.

10   Because it wasn't the way things had happened in the past.

11     Q.    And this letter is dated -- your email is dated

12   November 3rd.  And then Exhibit B that we looked at was dated

13   November 5th, correct?

14     A.    Yes.

15     Q.    And then turn to the first page of Exhibit C.  It

16   wasn't until after you received Exhibit B that you got this

17   reply from Mr. Zern, correct?

18     A.    Yes.

19     Q.    And were you concerned about this reply from

20   Mr. Zern?

21     A.    Yes.

22     Q.    Why were you concerned about that?

23     A.    Well, he put somebody else in charge of the loan.

24   And so I thought that that might be a change and that we

25   might be not able to work on things with them.

1      Q.    Now, the company had been through a bankruptcy in

2    2013 and you knew what that was like, correct?

3      A.    Yes.

4      Q.    And you got this letter in Exhibit B that we looked

5    at.  Did you consider filing another bankruptcy?

6      A.    Yes.  If it took that to protect the students and

7    the staff, yes.

8      Q.    Now turn for me to look at Exhibit D.

9       Before we get there, Mr. Vesterman, was there any

10   reason in your mind or any prohibition in your mind that you

11   could not have filed a bankruptcy on November 5th of 2015?

12     A.    No.

13     Q.    Now, Exhibit D, is this a document you prepared?

14     A.    It was prepared by a title company.

15     Q.    And your request?

16     A.    Yes.

17     Q.    And this document, if you look on the third page of

18   the exhibit, second page of the document, it looks like it

19   was done on November 20th, 2015; is that correct?

20     A.    Yes.

21     Q.    Why did you transfer this property on November

22   20th, 2015?

23     A.    I was scared, because I thought I would have

24   trouble paying for two bankruptcies.  And I knew that one

25   bankruptcy would be less expensive and something that I could

1  handle from cash flow standpoint.

2       Q.    And what was the business of SchoolCo at this time?

3       A.    SchoolCo, at that point, was not really in use.

4  Our tax attorney had recommended that we not use it any more.

5  And it was so cumbersome and expensive to use that structure,

6  that we were just effectively using Main Street School to pay

7  everything.

8       Q.    Did you receive the letter on November 5th and you

9  transferred this property, but you didn't put the company

10 into bankruptcy right then, did you?

11      A.    No.

12      Q.    And why not?

13      A.    I was willing to work with the Bank.

14      Q.    And we've looked at a series of emails.  But if you

15 turn to Exhibit C -- E for me.  Are you there, sir?

16      A.    Yes.

17      Q.    Does Exhibit E reflect a request for information

18 from Mr. Orgil and you providing Mr. Orgil with information?

19      A.    Yes.

20      Q.    Did you believe in December of 2015 that you could

21 still work things out with the Bank?

22      A.    Yes.

23      Q.    Did you provide Mr. Orgil with the information he

24 asked for?

25      A.    Yes.

1      Q.    After you provided Mr. Orgil with that information,

2    did you reach out to him again to see what was going on,

3    whether you could work something out?

4      A.    Yes.

5      Q.    Take a look for me at Exhibit F.  And, again, is

6    this a series of emails with you reaching out to Mr. Orgil to

7    try and work something out?

8      A.    Yes.

9      Q.    Were you worried in December of 2015 that you still

10   might have to file a bankruptcy?

11     A.    Yes.

12     Q.    You mentioned earlier that the reason you got

13   behind on your payments was the loss of a director; is that

14   correct?

15     A.    Yes.

16     Q.    When were you able to get that director replaced?

17     A.    By the end of 2014 we had a new director in place.

18   And so we started the school year in 2015 with a new

19   director.

20     Q.    Sir, I thought you testified a minute ago that you

21   made your payments all the way up until October of 2015?

22     A.    I apologize.  By the end of 2015, we had our new

23   director in place.  So we started 2016 with a new director in

24   place.

25     Q.    Did you inform the Bank that you had a new

1  director?

2      A.   I informed them, yes, that we had resolved our

3  director issues.

4      Q.   Were you still seeking to catch up with the Bank?

5      A.   Yes.

6      Q.   If you'll look for me at Exhibit G.

7       Is this a contact between you and Mr. Orgil in March

8  22nd when you expressed an interest in trying to catch up

9  your payments?

10     A.   Yes.

11     Q.   Do you have any response to this email of March

12  22nd?

13     A.   Yes.

14     Q.   Mr. Orgil indicate he was willing to work with you?

15     A.   No.

16     Q.   Now, the debtor did file this bankruptcy on July

17  4th, I think, of this year, correct?

18     A.   Yes.

19     Q.   Let me go back.

20      As we stand here today, how many students does the

21  debtor have?

22     A.   We have 51 students in the building with four more

23  coming this month and two next month.  So that's a total of

24  58.  Then we have two coming in January, so that's a total of

25  60 for January.

1      Q.    And at the time you were unable to make your

2   payments, you testified you had 24 students?

3      A.    Yes.

4      Q.    And at the time you were able to make your

5   payments, you had 30 students?

6      A.    Yes.

7      Q.    So you have more than doubled the amount that you

8   had in October of 2015?

9      A.    Yes.

10      Q.    Now, the school is operating right now, correct?

11      A.    Yes.

12      Q.    Earlier in this case we came into the court and

13   presented a budget of operations; do you recall that?

14      A.    Yes.

15      Q.    Would you take look at Exhibit H for me?

16       Was this your budget of operations for the July

17   through -- actually, I guess it's August through November?

18      A.    Yes.

19      Q.    Did you prepare this?

20      A.    Yes.

21      Q.    What was the projected income for the debtor for

22   August?

23      A.    $14,417.50.

24      Q.    Did the debtor have that much income in August?

25      A.    Yes.

1      Q.    And, in fact, if you'll take a look for me at

2   Exhibit I.  What does that indicate the debtor's August

3   income was?

4      A.    18,826.94.

5      Q.    Now, in the business you run, is that a cyclical

6   business?

7      A.    Yes.

8      Q.    When are the lower months in the business?

9      A.    The summer; June, July -- May, June, July, and

10  August.

11     Q.    Now under your budget under September under H you

12  project about $30,500 per month?

13     A.    Yes.

14     Q.    Based upon your current in-house population, will

15  the debtor make that number?

16     A.    Yes.

17     Q.    And that would provide the debtor with net income

18  of about $7,200?

19     A.    Yes.

20     Q.    Will the debtor have that number?

21     A.    Yes.

22     Q.    Does Main Street have employees?

23     A.    Yes.

24     Q.    How many employees have you got out there?

25     A.    Eight.

1      Q.    Now, after you solved your director issue by March

2   of 2015, was the debtor in a position where it could have

3   resumed its $7,000 payments to Celtic?

4      A.    Yes.

5      Q.    Was the debtor in a position, though, that it would

6   have been able to catch up the ones it had missed?

7      A.    No.

8      Q.    If the debtor is not allowed to keep this property,

9   will the debtor be able to reorganize?

10     A.    No.

11     Q.    Will the debtor be able to operate at all?

12     A.    No.

13     Q.    Is this building necessary for the reorganization

14  of the debtor?

15     A.    Yes.

16     Q.    If the debtor were to close down, what would happen

17  to all of the students?

18     A.    They'd have to find another school.

19     Q.    Would that impose a hardship on the students?

20     A.    Yes.

21     Q.    Would it impose a hardship on their parents?

22     A.    Yes.

23     Q.    And you'd also lose -- your employees would lose

24  their jobs, too, correct?

25     A.    Yes.

1      Q.    And is the debtor prepared to make payments to

2   Celtic Bank during the pendency of this bankruptcy case?

3      A.    Yes.

4            MR. LIEPINS:   Your Honor, I'll pass the

5   witness.

6                     CROSS-EXAMINATION

7   BY MR. MARTIN:

8      Q.    Mr. Vesterman, you said that the summertime is the

9   slow time?

10     A.    Yes.

11     Q.    So I would say, extrapolating from that, August

12   through May would be the busy time?

13     A.    Yes.

14     Q.    The school year, basically?

15     A.    Yes.

16     Q.    Did you make any payments from September of 2015

17   through May of 2016?

18     A.    No.

19     Q.    And that was the busy time of year?

20     A.    Yes.

21     Q.    And you testified about your enrollment.  When we

22   talked at the 341 Meeting, you told me that you told the

23   Trustee to break even for the school is 65 to 70 students?

24     A.    Yes.  That was the break even when we first started

25   operation.  Right now we have 60.  The Celtic loan was -- at

1    the beginning of the time we were paying, it was 12,500 as

2    opposed to 7,000.  And, also, we've reduced expenses since

3    then.  So now our break even is less than 65.

4         Q.    Didn't you just hire a new director?

5         A.    Yes.

6         Q.    So how have you reduced the expenses?

7         A.    The director's salary is not a huge percentage of

8    the total operations.

9         Q.    And there's a number of times in there where you

10   said that you provided the documents to the Bank that the

11   Bank requested?

12        A.    Yes.

13        Q.    Do you think that's the same thing as making

14   payments?

15        A.    No.

16        Q.    So were you in default of the agreement?

17        A.    Yes.

18        Q.    And do you feel like the Bank had a right to

19   foreclose?

20        A.    Yes.

21        Q.    Did your warranty deed prevent the Bank from

22   foreclosing?

23        A.    I'm sorry, could you explain the question?  Do you

24   mean the transfer of the warranty?

25        Q.    The warranty deed that you filed from SchoolCo to

```
 1  Main Street.

 2       A.   Yes, yes, it did.

 3       Q.   Did that prevent the foreclosure?

 4       A.   Yes.

 5       Q.   Did your bankruptcy filing prevent the foreclosure?

 6       A.   Yes.

 7       Q.   And you said earlier that your income dropped

 8  precipitously in 2015?

 9       A.   Yes.

10       Q.   Would you look at Exhibit F with me briefly?  I'm

11  sorry, E, Exhibit E in the blue book.

12       A.   I'm sorry, which exhibit?

13       Q.   Exhibit E in the blue book.

14       A.   Yes, I see Exhibit E.

15       Q.   All right.  There's an email here from you to

16  Mr. Orgil that says that, Our revenue has increased

17  remarkably in the past 3 years to 316,000 in 2015.  That

18  doesn't sound like decreasing precipitously, does it?

19       A.   Our accrual revenue has increased.  Our cash flow

20  was lower in 2015.  And now it's back on schedule.

21       Q.   Okay.  But you testified to the Court just now that

22  your income was falling off a cliff, but you presented to the

23  Bank that you were making more money every year as you went.

24       A.   Yeah.  Those are accrual revenues and we were.  But

25  when you're behind on cash flow, you have to catch up.  It
```

1  takes months to catch up.  And we were behind on cash flow.

2       Q.   Uh-huh.  Do you think honest communication is also

3  paramount?

4       A.   Yes.  I believe I was being honest when I was

5  presenting these numbers.  Because when you have higher

6  revenues, your cash flow can catch up.

7       Q.   Do you think the business, the montessori school,

8  can that operate at a different location?

9       A.   No.  This is a specialized building that is built

10 to be a montessori school where the classrooms have specific

11 design.  There's a specific sized playground.  And it is in a

12 specific location that's attractive to parents.  Because it's

13 out in the country.  It's got 200 acres in front of it.  So

14 it's not in a strip mall like a lot of schools.

15      Q.   So is it your testimony to the Court that this

16 business could not be operated at any other location

17 anywhere?

18      A.   It would take about -- it would take hundreds of

19 thousands of dollars to switch to another location.  And then

20 the revenues would be up in the air, because we wouldn't have

21 the same -- in order to build something like this, it would

22 take millions of dollars.

23      Q.   Okay.  I didn't ask about building it.  Could it be

24 operated in a different building?

25      A.   Not -- not to the extent it's operated now, because

1  we would have different facilities that would be sub par.  We

2  would have a different location that would be less attractive

3  to the parents.

4      Q.   Would it be possible to operate in a different

5  building?

6      A.   Not to the extent that we're operating now.  We

7  would lose customers, if we tried to move.

8      Q.   Potentially.  But would it be possible?

9           MR. LIEPINS:  Your Honor, asked and answered.

10          THE COURT:  Sustained.

11          MR. MARTIN:  Your Honor, he's not answered.

12          THE COURT:  Sustained.

13          MR. MARTIN:  Nothing further, Your Honor.

14          THE COURT:  Thank you.

15          MR. LIEPINS:  Nothing further, Your Honor.

16          THE COURT:  The witness may step down.

17      Any other evidence you wish to present, Mr. Liepins?

18          MR. LIEPINS:  No, Your Honor.

19          THE COURT:  All right.  Does the debtor rest?

20          MR. LIEPINS:  Yes, Your Honor.  I'm sorry.

21          THE COURT:  Okay.  Is there any other evidence

22  you wish to present?

23          MR. MARTIN:  No, Your Honor.

24          THE COURT:  Okay.  Give me just a moment and

25  I'll hear closing.  Okay?

1       Okay.  I'll hear closing.

2               MR. MARTIN:  Your Honor, this isn't a normal

3    case of a debtor that just needs a breathing spell to get

4    back on its feet and start making money.  We've been through

5    this before and they've already worked it out.  It didn't

6    work.  And nobody feels worse about that than the Bank.

7    The -- you heard Mr. Zern testify that he really wanted this

8    debtor to succeed.  And he worked with them over a number of

9    years.  Not just short term, but through out -- two to three

10   years and then throughout a bankruptcy.  And gave him more

11   leash and gave him more rope and just kept trying to work it

12   out with them.  And it just hasn't happened.

13       And, I mean, you can see from his schedules that it not

14   only the Bank that he doesn't pay.  His debtors from 2013 are

15   essentially identical to his debtors in 2016, or his

16   creditors, because he's just not paying them.  And it's

17   unfortunate, but essentially it's just a -- it's a business

18   that can't quite make it, that can't quite turn a profit.

19   And while unfortunate, that risk and liability and loss

20   shouldn't be shifted from the debtor to its creditors,

21   especially its creditors that have worked with him in good

22   faith for all of these years to try and help him make it.

23   And it's not like he went out and got more cash or brought in

24   more investors or changed anything so that he could pay them

25   off and get caught up.  You heard the debtor testify that he

1   didn't just have to make payments.  He has to make catch up

2   payments.  He's in arrears.  He's been turning a profit for

3   over a year and not paying the Bank.  And as I said, the

4   Bank, they had the deed in hand.  They could have filed it.

5   But they trusted this debtor and they tried to work with him.

6   And he filed it behind their back to make their prior

7   negotiated settlement, which is the only reason that they

8   entered into the settlement agreement and the Court approved

9   was to give them another chance.  But through -- as

10  additional security, because they had gotten to the point

11  where they didn't trust the debtor to make any payments, they

12  got the deed in lieu so that they could avoid this, and

13  avoid -- even avoid foreclosure.  Just give him another

14  chance.  But if he doesn't make it, we have a deed.  We get

15  the property.  The debtor reneged on that deal.

16      And then on top of that, didn't give the Bank notice.

17  Continued to negotiating with them, after he filed the deed

18  behind their back without telling them.  And then when they

19  tried to go through their other process to get the property

20  back, files a bankruptcy and here we are.  Your Honor, this

21  is an abuse of the Bankruptcy Code.  This is an abuse of the

22  bankruptcy protection.  And the evidence has shown you the

23  debtor has taken actions that constitute bad faith and cause

24  for dismissing this case.  And Celtic Bank respectfully would

25  request that Your Honor review the evidence.  And based on

58

1    the testimony today, dismiss this bankruptcy case.

2        And further, Your Honor, we would ask that per the terms

3    of the -- enforce the prior settlement agreement and order

4    the debtor to deed the property to the Bank, so they can get

5    what they negotiated for the first time.

6            THE COURT:  Thank you.

7            MR. LIEPINS:  Your Honor, the debtor filed

8    this case to try and keep the school that's been operating

9    for a number of years.  And while there were two companies,

10   they were liable on the debt to the Bank and all of the

11   payments had come from Main Street.  The debtor could have

12   filed two cases, but he did not.  He did transfer the

13   property to his operating company.  He thought he was being

14   smart about it.  He thought he was doing that so he could

15   save some money, if he had to file a bankruptcy.  He wasn't,

16   obviously.

17       However, he was still perfectly within his rights under

18   the terms of the negotiated settlement agreement to file a

19   bankruptcy for SchoolCo.  There was no prohibition against

20   that.  And he could have done that.  In a perfect world, he

21   would have just filed two cases.  But he didn't do that.

22       While this Court see cases all the time of a Little

23   Creek type where there's a transfer of property on the eve of

24   foreclosure, here it's sort of a reverse Little Creek.  The

25   debtor transferred a single asset into an operating company

1   that has other assets and that has employees and that has

2   income.  And it has an ability to make payments, as opposed

3   to transferring it to another entity that has nothing on the

4   eve of foreclosure.  And here, granted should have been

5   notified, I agree.  But it was transferred in November after

6   the default letter, and the bankruptcy wasn't filed until

7   July of this year.  It wasn't, again, on the eve of

8   bankruptcy.

9        The debtor clearly needs this property to reorganize.

10  And the debtor has increased enrollment.  That was the

11  testimony.  The debtor has operated at or above the numbers

12  that it projected.  The debtor's enrollment has almost

13  doubled since the last time it was able to make a payment.

14  The debtor has solved the problem that both the debtor and

15  the Bank agreed was the issue with the loss of the director.

16  And closing the school would have a tremendous hardship not

17  only on the children, but also on the employees and also on

18  their parents.

19        We would ask the Court not to dismiss this bankruptcy

20  and to deny the motion for relief from stay.  And as the

21  debtor testified, the debtor is prepared to make adequate

22  protection payments to the Bank during the pendency of this

23  case.

24        Thank you, Your Honor.

25             THE COURT:  Okay.  Let's take a recess until

1    3:45 and I'll rule on the record.  We stand in recess.

2                        (Brief recess ensued.)

3                    COURTROOM DEPUTY:  We're back on the record in

4    the Main Street, LLC.  Case 16-41222.

5                    THE COURT:  All right.  I think the parties

6    have already made their closing arguments before we recessed.

7    And the Court is now going to rule on the record.

8            Celtic Bank, a corporation, seeks to dismiss this case

9    pursuant to Section 1112(b).  Alternatively, Celtic Bank

10   seeks relief from the automatic stay to proceed with

11   foreclosure on certain real property.  The debtor opposes

12   both motions.

13           The Court has considered the evidence presented by the

14   parties at the hearing today, as well as the argument of

15   counsel.  The Court makes the following findings of fact.

16   Main Street Schools, LLC, operates a montessori school.  The

17   property where the school operates was owned by SchoolCo Real

18   Estate, Ltd., until recently.  Main Street occupied and used

19   SchoolCo's single asset, a property known as 7400 Hawk Road

20   in Flower Mound, Texas.  William Vesterman is a principal of

21   Main Street, as well as a principal of SchoolCo.  Main Street

22   is obligated on a note to Celtic Bank.  The note is secured

23   by the Hawk Road property.  Because SchoolCo owned the

24   property when the note was created, SchoolCo by and through

25   its principal, Mr. William Vesterman, signed the deed of

1  trust.

2        Main Street and SchoolCo filed prior bankruptcies

3  before this Court approximately two years ago.  In the prior

4  cases, the two debtors and Celtic Bank entered into a

5  settlement agreement providing for a modification of the note

6  to reduce payments due.  And -- I'm sorry, just to reduce the

7  payments, among other things.  The settlement agreement also

8  required execution and delivery of a general warranty deed to

9  the Hawk Street property in favor of Celtic Bank for Celtic

10  Bank to hold in escrow.  If Main Street defaulted on the

11  note, Celtic Bank could file and record the deed without

12  further order from this Court.  We've been referring to that

13  on the record today as a deed in lieu.  The delivery of a

14  general warranty deed to Celtic Bank was a key component of

15  the settlement agreement.  The Court approved the settlement

16  agreement in an order dated February 4th, 2014.  In

17  accordance with the settlement agreement, the Court dismissed

18  the prior case of Main Street and SchoolCo.

19        Main Street's income, while initially may have been

20  sufficient to service the debt, dropped precipitously and

21  Main Street defaulted on its required payments to Celtic

22  Bank.  Celtic Bank has not received a payment from Main

23  Street on the note since September 28th, 2015.  Celtic Bank

24  sent Main Street a default letter dated November 5, 2015.

25  While negotiating a forbearance agreement with Celtic Bank,

1    SchoolCo transferred the Hawk Road property to Main Street.

2    The deed transferring the real estate from SchoolCo to Main

3    Street was signed on November 20th, 2015 and recorded on

4    November 24th, 2015.  A default letter from Celtic Bank was

5    dated November 5th, 2015, a mere 15 days prior to the deed

6    transferring the real estate asset to Main Street.  The

7    transfer was not disclosed to Celtic Bank.  SchoolCo

8    transferred the property to Main Co -- I'm sorry.  SchoolCO

9    transferred the property to Main Street specifically to

10    thwart the settlement agreement and this Court's order

11    approving the settlement agreement.  Celtic Bank discovered

12    the transfer when it attempted to record the general warranty

13    deed it had been holding in escrow.  SchoolCo's transfer of

14    the property to Main Street rendered the general warranty

15    deed worthless.  Celtic Bank posted the Hawk Road property

16    for foreclosure sale on July 5th, 2015.  On the eve of the

17    foreclosure, July 4th, 2016, Main Street filed this case.

18        The current principal and interest owed by Main Street

19    on the note is approximately $1.1 million.  With these facts

20    in mind, the Court makes the following legal conclusions.

21        This is a core proceeding pursuant to 28 USC Section

22    157(b)(2)(A) and (O).  Celtic Bank seeks dismissal or

23    conversion of this case for cause, specifically Main Street's

24    bad faith in filing this case.  Under 1112(b)(1), a party in

25    interest may request a Chapter 11 case be converted to

1    Chapter 7 and to resolve this request, the Court shall

2    dismiss or covert the case for cause, whichever is in the

3    best interest of creditors.    Cause exists when a debtor acts

4    in bad faith, which is a multi-factor determination

5    administered by the bankruptcy judge as sound discretion.

6    See In re Jacobson, 609 F.3d 647 at 660, 5th Circuit, 2010;

7    matter of Little Creek, 779 F.2d 1068, 5th Circuit, 1986.

8    If a motion to dismiss a case is opposed, the moving party

9    has the burden of proof on the issue of cause.    See e.g. In

10   re Page, 11 BR 456 at 459, Bankruptcy Northern District of

11   Texas, 1990.

12          Here, this is Main Street's second bankruptcy case in

13   two years.    Main Street breached agreements in its prior

14   case, which this Court approved.    And the Court dismissed the

15   prior case in accordance with the parties agreement.    Main

16   Street filed a present case to thwart the prior order of this

17   Court approving the settlement agreement.    Use of the

18   bankruptcy process as a litigation tactic to circumvent this

19   Court's order is an abuse of the bankruptcy, constituting a

20   lack of good faith in filing, which warrants dismissal.    See

21   e.g. In re Sherwood Enterprises, Inc., 1112 BR 165 at 171,

22   Bankruptcy Southern District of Texas, 1989 citing In re HVA

23   East, Inc., 87 BR 248, Bankruptcy Eastern District of New

24   York, 1988.

25          For all those reasons, the Court concludes the

1  dismissal of Main Street's petition is warranted under

2  1112(b) of the Bankruptcy Code.   In light of the Court's

3  conclusion on the motion to dismiss Celtic Bank's motion to

4  lift the stay, I'm going to ask counsel for Celtic Bank to

5  submit an order to the Court consistent with the Court's

6  ruling.   That form of order is due within 7 calendar days.

7        Thank you.   Parties are excused and we are adjourned.

8                    (End of Proceedings.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  C E R T I F I C A T E

 2           I, CINDY SUMNER, do hereby certify that the

 3    foregoing constitutes a full, true, and complete

 4    transcription of the proceedings as heretofore set forth in

 5    the above-captioned and numbered cause in typewriting before

 6    me.

 7

 8

 9

10

11

12

13

14                             /s/Cindy Sumner

15                             _____

16                             CINDY SUMNER, CSR #5832
                               Expires 12-31-17
17                             National Court Reporters
                               16 Gettysburg Lane
18                             Richardson, Texas  75080
                               214 651-8393
19                             Firm #417

20

21

22

23

24

25
```